JOSEPH H. BRUGMAN ET AL., APPELLEES, v. HENRY J. BRUGMAN, APPELLANT.

FILED MARCH 28, 1913. No. 17,128.

1. **Deeds:** CANCELATION: MENTAL CAPACITY: BURDEN OF PROOF. Where it is sought to cancel a deed for the want of mental capacity of the grantor to make the instrument, the burden of proof is on the one who alleges the mental incapacity.

2. ———: EXECUTION: MENTAL CAPACITY. In determining the mental capacity of the grantor to execute a deed, if it clearly appears that when the instrument was executed the grantor had the capacity to understand what he was doing, knew the nature and extent of his property, and what he proposed to do with it, and to decide intelligently whether or not he desired to make the conveyance, it cannot be said that he was incompetent or incapable of executing the instrument.

3. ———: ———: UNDUE INFLUENCE: HUSBAND AND WIFE. A conveyance of real estate by a wife to her husband for an express, nominal consideration may raise a presumption of undue influence; but this is a rebuttable presumption, and, if the facts and circumstances surrounding the transaction are such as to show that her act was just and for her own good, the burden of proof rests on the one who attacks the conveyance to establish the fact of undue influence.

4. ———: ———. The undue influence which will avoid a deed is an unlawful or fraudulent influence which controls the will of the grantor. The affection, confidence and gratitude of a parent to a child, a husband to a wife, or a wife to her husband, which inspires the gift, is a natural and lawful influence, and will not render it voidable, unless this influence has been so used as to confuse the judgment and control the will of the donor. *Hacker v. Hoover*, 89 Neb. 317.·

APPEAL from the district court for Boone county: JAMES R. HANNA, JUDGE. *Reversed and dismissed.*

*Frank D. Williams,* for appellant.

*H. C. Vail, contra.*

BARNES, J.

This action was commenced in the district court for Boone county to cancel and set aside a quitclaim deed executed and delivered by one Julia A. Brugman, now deceased, to her husband, Henry J. Brugman, conveying to him an undivided one-half interest in the west half of section 29, township 21, range 6 west, situated in that county. A trial in the district court resulted in a decree for the plaintiffs, and the defendant Henry J. Brugman has appealed.

Upon the issues made by the pleadings, the burden of proof was on the plaintiffs to show that their mother, Julia A. Brugman, paid a part of the consideration for the purchase of the land in question out of her separate estate. The plaintiffs to maintain that issue produced the testimony of Joseph Brugman to the effect that, when he was about nine years of age, he heard it stated in certain conversations in the family that his mother had at one time received about $1,400 from her father's estate, and a part of that money was contributed to the purchase of certain property, used as a home for the family, in David City; that the proceeds of that property were used as a part of the purchase price of the land in question. On the other hand, defendant Henry J. Brugman testified that at the time he married his wife they each possessed a small amount of money, which was used up in living expenses; that his wife, later on, received about $700 from her father's estate, which was used in defraying her expenses during a long period of illness from which she was suffering, in household expenditures, and business ventures; that when the family moved to David

City his wife had only about $100; that no part of her
estate was used in the purchase of the David City prop-
erty; that he purchased that property with the results of
his own labors as a carpenter, and with money borrowed
from his sister; that he built a house thereon, and other-
wise improved the property; that the proceeds of the
David City home furnished the money consideration for
the land in question, which was and is heavily incum-
bered, and at his request was conveyed to himself and
wife jointly; that from the proceeds of his labor on the
farm he has paid the taxes assessed against it, and the
interest on the mortgages, and reduced the amount of the
incumbrance; that he has made lasting and valuable im-
provements on the farm; that, owing to his wife's ill
health, she was unable to assist him in bearing his bur-
dens; that he has paid a large sum of money as hospital
fees and for medical attendance in his endeavors to cure
her maladies; that he has been compelled by his own labor
to carry on the farm, and at the same time care for his
sick wife, and perform his own household work, such as
cooking his own meals, etc.; that the plaintiffs left home,
and for many years have been engaged in business for
themselves; that they have furnished nothing for the sup-
port of either their father or mother, and have contributed
nothing to pay for or improve the land in question. As
we view this evidence, plaintiffs have failed to establish
the allegations of their petition, so far as this branch of
the controversy is concerned.

Plaintiffs, by their petition, alleged that, at the time
the deed in question was executed, their mother, Julia A.
Brugman, was of unsound mind, and incapable of under-
standing the nature of the transaction, and that she was
mentally incompetent to make such an instrument. De-
fendant Henry J. Brugman denied those allegations, and
therefore the burden of proof was upon the plaintiffs to
maintain that issue.

The evidence discloses that Mrs. Brugman was a large
woman, weighing about 250 pounds; that it was always

difficult for her to move about; that in May, 1906, while living with her husband upon the farm, she suffered a paralytic stroke, which affected her right side, and rendered her speech somewhat labored; that her husband was kind, careful and considerate in attending to her wants; that, later on, he took her to a hospital in Columbus, Nebraska, where she was treated by a firm of physicians styled Martyn, Evans & Evans; that she received considerable benefit from the treatment, and in the early fall of that year returned to the farm, where she was again cared for by her husband; that during that fall, and the following winter, she attended church on Sundays, and was able, to some extent, to move about; that in the early spring of 1907 her husband again took her to the hospital in Columbus, where she was placed under treatment by the doctors above named; that the defendant Henry J. Brugman asked Doctor C. D. Evans, a member of the firm, to advise him whether his wife was capable to make the deed in controversy; that Doctor Evans told him that he would let him know later on; that, in pursuance of defendant's request, a consultation was held between Doctor D. T. Martyn, Doctor W. S. Evans, and Doctor C. D. Evans; that they all participated therein, and were all of one accord that Mrs. Brugman was mentally competent to make the deed, and a letter was written by Doctor C. D. Evans to her husband so advising him. It is true that Doctor Evans, when giving his testimony in the instant case, stated that, if he wrote such a letter, he was mistaken as to her condition at that time. It appears, however, that appellant, Henry J. Brugman, received the letter, and his testimony as to its contents was as follows: "If you have any papers you wish your wife to sign, she is in a capable condition to sign them. Come right down." In response to that letter Brugman went to Columbus on June 18, 1907, and while there saw Doctor C. D. Evans, who said his wife was capable and all right, to go ahead. He was asked by the doctor to go across the square to the office of Mr. Beecher, a notary

public; that Beecher drew the deed at his request, and thereupon they drove around to the Doctor's office, where Doctor W. S. Evans identified Mr. Brugman, and told Mr. Beecher that it was all right, to go up and execute the papers; that on reaching the hospital, and going to Mrs. Brugman's room, they found her sitting in a chair, with a book in her lap. When asked how she was, she said: "About like always." Her husband then told her that Mr. Beecher was a notary, and had come down to get her to sign the deed. There were present the notary, a Mr. Fisher, who witnessed the deed, and one of the sisters in charge of the hospital; that the notary thereupon explained to Mrs. Brugman that he had come there to make a deed transferring her interest in some land to her husband. The notary read part of the deed to her, stated its contents, and what it conveyed, and she went over to the table, he assisting her in walking, and signed the deed with the pen in her right hand, and acknowledged it as her voluntary act; that the deed was then delivered to Brugman, who filed it for record in January following his wife's death. Brugman testified that he did not think he had been down to see his wife but once before the deed was signed; that he visited her that afternoon; that she asked him in particular about the boys; that thereafter he went down to Columbus to see her about every two weeks until the latter part of the fall; that she always recognized him, and always asked about the boys; that he first noticed, about the middle of August, that she was getting weaker, and her speech was more labored; that he was there again about September 22; that his wife was getting weaker, but still she recognized him; that he was in poor health, and saw her but once more while she was alive; that he took the title from her to the land so that if anything happened to him the boys would get it as his heirs.

It further appears that on October 28 he had a sale of all of his personal property, and put the proceeds, amounting to $1,662.24, into the farm. The notary testi-

fied that he drew the deed in controversy on June 18, 1907; that he went with Brugman on the same day to his wife's room at the hospital; that he did not notice anything unusual in her mental condition; that he took her acknowledgment believing her competent to execute the deed; that he partly read and explained the deed to her, and that he would not have certified to the deed had she not assented to it as her voluntary act. It should be observed that Doctor Martyn and Doctor W. S. Evans both testified that they saw Mrs. Brugman, and treated her nearly every day, at and about the time she made the deed in question; that she was capable of executing it, and they testified positively that in their opinion she was mentally capable of executing that instrument. There is considerable testimony in the record tending to show that Mrs. Brugman's mind was somewhat affected by her illness, and that she was physically weak and very ill.

It is not every weakness of mind arising from old age or sickness, or other causes, that will avoid a deed. There must be a total want of reason or understanding. *Johnson v. Phifer*, 6 Neb. 401. Mere mental weakness will not authorize a court of equity to set aside an executed contract. *Mulloy v. Ingalls*, 4 Neb. 115; *Schley v. Horan*, 82 Neb. 704; *Mann v. Keene Guaranty Savings Bank*, 86 Fed. 51. In order to vacate a deed on the ground of mental incapacity of the grantor, it is necessary to show such a degree of mental weakness as renders the maker of the deed incapable of understanding and protecting his own interest. The mere circumstance that the mental powers have been somewhat impaired by age or disease is not sufficient, if the maker of the deed still retains a full comprehension of the meaning, design and effect of his act, unless by reason of undue influence of the grantee he was unable to exercise his will in that respect. Therefore, to our minds, the evidence is not sufficient to overcome the presumption of Mrs. Brugman's mental capacity, and the testimony of defendant's witnesses tending to establish her competency to make the deed in question.

We come now to consider the question of undue influence: It may be conceded that, where a wife makes a deed of property to her husband for a stated nominal consideration, undue influence on his part may be presumed; but that is a rebuttable presumption, which may be overthrown by the facts and circumstances surrounding the transaction. On this question the evidence discloses that Brugman had visited his wife but once or twice from the time she went to the hospital at Columbus in the early spring of 1907 to the date of the conveyance, and therefore the opportunity to even suggest to her that she should make the conveyance, much less to urge her to perform that act, was practically wanting. It also appears, without dispute, that there was no meeting between Brugman and his wife on the day the deed was executed prior to the time of its execution; that when Brugman, the notary and the witnesses called upon Mrs. Brugman at the hospital, her husband took no part in the conversation; that the purpose of their visit was communicated to Mrs. Brugman by the notary, who also explained to her the nature of the transaction, and gave her whatever assistance she required to enable her to sign the instrument. This of itself seems sufficient to overthrow the presumption of undue influence. In addition to this testimony, it must be presumed that Mrs. Brugman was aware of her husband's financial condition. She knew that the farm was heavily incumbered; that in order to facilitate the renewal of the mortgages, and thus prevent foreclosure proceedings, and save the farm for his use and the future use of their children, the only feasible way to accomplish that end was to invest him with the whole title to the estate. This was a wise, just and equitable method of procedure. In such case there is no presumption of undue influence. Indeed, in cases of this kind much depends upon the circumstances, and when it appears that the deed of gift or voluntary conveyance is a just and natural act, and one which a person in full possession of his faculties might and ought to make, then the burden remains with the

party who assails the gift or conveyance. *Cudney v. Cudney*, 68 N. Y. 148; *Schofield v. Walker*, 58 Mich. 96; *Dailey v. Kastell*, 56 Wis. 444.

Undue influence which will avoid a deed is an unlawful or fraudulent influence, which controls the will of the grantor. The affection, confidence and gratitude which inspires the gift from a wife to a husband is a natural and lawful influence, and will not render it voidable, unless the influence has been so used as to confuse the judgment and control the will of the donor. *Hacker v. Hoover*, 89 Neb. 317.

It appears in this case that Mrs. Brugman did a just, perfectly reasonable, and natural act. She did what any person in the full possession of his faculties and uninfluenced by the wrongful pressure of another might well have done. Her sons were each and severally working for themselves. They had not contributed to the care and expense of their mother. The land was not productive. It was heavily incumbered at a high rate of interest, which was required to be paid yearly. It was necessary to keep up the taxes and the insurance, and some repairs upon the premises would be required each and every year. She was an invalid, with attendant heavy expenses. She knew that her husband had performed most of the housework, and had conducted the farm, and looked after her wants as well; that his health was failing, and his burdens were heavy. He was the only person on whom she could rely for sustenance and sympathy, and she evidently considered that he could better care for her, and for himself, if the property in question could be saved from the incumbrances and made available for their use.

We are therefore of opinion that, in view of all of the circumstances, the findings and judgment of the district court should have been for the defendant.

For the foregoing reasons, the judgment of the district court is reversed and the action is dismissed.

REVERSED AND DISMISSED.

REESE, C. J., ROSE and FAWCETT, JJ., concur.

LETTON, SEDGWICK and HAMER, JJ., not sitting.